UNITED STATES DISTRICT COURT
STATE OF NEW JERSEY
-------------------------------------------------------------- X
WINTRUST SPECIALTY FINANCE, A DIVISION    Case No. 20-CV-16589-SRC-CLW
OF BEVERLY BANK & TRUST CO. N.A.

                                                 Return Date: As Determined by the
                                                 Court

                          Plaintiff,
      -against-

PINNACLE COMMERCIAL CREDIT INC.

                         Defendant
-------------------------------------------------------------------X

### DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

Respectfully Submitted by
CHARLES J. LANGE, JR., ESQ.
Attorneys for Defendant
640 Palisade Avenue Suite 101
Englewood Cliffs, NJ 07632
Email charles@njlawyer-lange.com
Phone 201-363-1230

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     1


PRELIMINARY STATEMENT  &
STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     3


ARGUMENT


POINT I
PLAINTIFF HAS NOT ESTABLISHED IT IS ENTITLED TO SUMMARY
JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     6

    THE CONTRACT DOES NOT SPEAK TO WIRE TRANSFERS . . . . . .     8

    PLAINTIFF CONCEDES THAT THE ORIGINATOR AGREEMENT
    DOES NOT DEFINE WHO BEARS THE RISK OF A HACKED WIRE
    TRANSFER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     10

    PLAINTIFF HAS NOT ESTABLISHED IT IS ENTITLED
    TO ANY DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     11


POINT II
DEFENDANT IS ENTITLED TO SUMMARY JUDGEMENT . . . . . . . . . . . .     13

POINT III
DEFENDANT'S AFFIRMATIVE DEFENSES SHOULD SURVIVE TO BE
HEARD BY THE TRIER OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     18


CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .     19

## TABLE OF AUTHORITIES

Cases                                                                                          Page

Aguilar v. Atlantic Richfield Co., 25 Cal 4th 826 (2001). …………………………    6

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)……………………………    6,7,16

Cherewick v. State, 578 F.Supp. 1136 (S.D.  2022)………………………………..    7

Congdon v. Uber Technologies, 291 F.Supp 3d 1012 (N.D. Cal. 03/08/2018)…….    10

Dokes v. Safeway Inc., 2018 WL 1518562 (E.D.Cal. 03/28/2018)…………………    7,12,11

First National Bank of Arizona, v. Cities Service Co., 391 U.S.253 (1968)………    6

Golden State Concessions LLC v. Wells Fargo Bank N.A., 2021 WL 5002222
( N.D.Cal.03/10/2021)……………………………………………………………    8

Hickcox-Huffman v. US Airways, Inc., 855 F.3d 1057, 1062 (9th Cir. 2017) …….    7

Jetcrete North America L.P. v. Austin Truck & Equipment Ltd. 484 F.Supp. 3d 915
( D. Nevada 2020)…………………………………………………………………    12,14

Kagan v. Wachovia Securities LLC ( N.D. Cal. 07/07/2010)……………………..    8

Marino v. Indus. Crating Co., 358 F. 3d 241, 27 (3d Circ. 2004)………………….    7

Matsushita Electrical Industrial Co.Ltd. v. Zenith Radio Corporation, 475 U.S.574
(1986) ……………………………………………………………………………...    15,16

Miller v. Glen Miller Productions Inc., 454 F. 3d 975 (2006)………………………    11

Porter v. California Department of Corrections, 419 F.3d 885 (9th Circ. 2005)………    7

Rogers v. Harker, 2021WL 2104966 (S.D. Cal. 05/25/2021)…………………………    7

Swinden v. Vanguard Group Inc., 2009 WL 3415376 (N.D. Cal. 10/21/09)………….    8,9,10

Twaite v. Allstate Ins. Co., 216 Cal. App. 239, 253 (1989)……………………………    8

Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir.2003)…………    8

Western Filter Corp. v. Argan Inc., 540 F.3d 947 (9th Circ. 2008)……………………    10

United States. v. Diebold Inc, 369 U.S.654 (1962)……………………………………..    7

## PRELIMINARY STATEMENT
## & STATEMENT OF FACTS

Defendant, Pinnacle Commercial Credit Inc., respectfully submits this Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment which should be denied in its entirety and in support of its Cross Motion for Summary Judgment along with such other and further relief as this Court may deem just and proper.

This matter was commenced by filing of a Summons and Complaint dated November 19, 2020. (Pl. Exh. "A"). Defendant served an Answer with affirmative defenses dated February 1, 2021. (Pl. Exh. "B"). An Amended Complaint dated February 26, 2021 was filed on March 1, 2021. (Pl. Exh. "C"). Defendant served and filed an Amended Answer with affirmative defenses on March 15, 2021. (Pl. Exh. "D").

Defendant is a corporate entity which for over 34 years has been in the business of facilitating financing for companies which need to purchase commercial equipment. It has had a business relationship with Plaintiff for less than a year. (Decandido Cert. Para. 2,3) Interestingly, the certification of Mr. DeCandido provides his insight as to the custom and usage of the trade where he states that during the handling of the thousands of transactions by his firm, there had never previously been a request to verify the wire transfer instructions as this had always been done by the lender to whom the transaction was being assigned. He was unaware on July 16, 2020 that such a request had been made by Wintrust in the Devault transaction. In addition, he affirms that his understanding of the originator agreement in this transaction as well as all prior agreements between his company and proposed lenders was to the effect that the documents

subject to any representation on the part of Pinnacle was as to the "executed" documents. Thereby limiting Pinnacle's responsibility to the bona fides of the transaction and the bona fides of the purchaser's ability to pay and it was only those documents which were subject to any warranties or representations by Pinnacle as these were the only documents for which Pinnacle was responsible. Similarly, Ms. Realmuto's cetification provides she had never previously been requested to verify wire transfer instructions by a lender with whom she was working on a transaction, that such responsibility was always deemed to be that of the bank funding the transaction. Further, that her transmittal of payment instructions was merely an accommodation to the bank that was to fund the transaction, she neither read nor analyzed the payment instructions which had previously been submitted nor the one submitted which turned out to be fraudulent. Finally, she indicates that after receipt of the request from Ms. Wood seeking verification, Ms. Wood funded the wire without affording her the ability to address the request.

On or about April 7, 2020, Defendant and Plaintiff entered into the Originator Program Agreement. (Exh. "A" to brief). The Originator Program Agreement does not address wire transfers of monies nor make any provision for or determine either party's obligations with respect to Wintrust funding of those transactions taken by assignment. The Originator Program Agreement provided that the parties agreed that in any suit that would arise, to proceed in the County of Orange, State of California. (Exh. "A" to brief, para "19"). Plaintiff ignored Paragraph "19" of the parties' contract and filed its Complaint in New Jersey in contravention of the Originator Program Agreement. [1]

---

[1] Plaintiff sets forth in its Amended Complaint dated February 26, 2021 that pursuant to 28 USC Sec. 1332 because there is diversity between the parties and "Pinnacle is a citizen of New Jersey" that jurisdiction and venue in New Jersey is proper. (Pl. Exh. "C", paras. "4, 5"). Plaintiff does not specify in the Amended Complaint that its claims are brought under California law.

On or about July 9, 2020 Defendant entered into the Security Agreement with Devault to provide financing for the purchase of a new 2020 Oshkosh model S-2204 concrete mixer, in the amount of Two Hundred Thirty-Seven Thousand, Seven Hundred and Fifty-Three Dollars ($237,753.00). (Pl. Exh. "B" to brief).  The Security Agreement provided *inter alia* that Defendant held a first priority security interest in the concrete mixer and would receive monthly payments of Four Thousand Four Hundred Thirty -Seven Dollars and Eighty-Four Cents ($4,437.84) from Devault. (Pl. Exh. "B" para "2").   The Security Agreement provided that it was assignable by the secured party, Defendant. (Pl. Exh. "B" para "3").

On or about July 9, 2020, Defendant and Plaintiff entered into the Assignment wherein Defendant assigned all of its rights pursuant to the Security Agreement (Devault contract) to Plaintiff. (Pl. Exh. "C").[2]  In furtherance of the Assignment and as part of the consideration due Defendant, Plaintiff was to pay Oshkosh, the manufacturer of the cement mixer. On or about July 16, 2020 Plaintiff wired funds to Oshkosh which in fact were never received by Oshkosh. It seems that an interloper hacked the email account of either Devault or Oshkosh and Plaintiff was the recipient of hacked payment transfer instructions. It is not known where the hack occurred.

The Court is respectfully referred to the Certification of Ed Decandido and Certification of Paula Realmuto, together with the exhibits annexed thereto and Defendant's Local Rule 56.1 Counterstatement of Material Facts dated August 11, 2023 and the Exhibits annexed thereto for a full recitation of the facts herein.

---

[2] The Security Agreement provided inter alia at Paragraph "15" that debtor (Devault) irrevocably consented to venue and jurisdiction in New Jersey and could not raise any defenses other than those under New Jersey law.

# POINT I
## \PLAINTIFF HAS NOT MET ITS BURDEN AND IS NOT ENTITLED TO SUMMARY JUDGMENT

Summary judgment is a remedy which should be used sparingly by the Courts. "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. (Citation omitted)". Aguilar v. Atlantic Richfield Co., 25 Cal 4ᵗʰ 826 (2001).

Pursuant to Rule 56 (c) of the Federal Rules of Civil Procedure, summary judgment may only be awarded if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Most importantly, "summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

Furthermore, "[i]t is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is *not* required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. citing First National Bank of Arizona, v. Cities Service Co., 391 U.S.253 (1968). (Emphasis Supplied). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Indus. Crating Co., 358 F. 3d 241, 27 (3d Circ. 2004). See also Porter v. California Department of Corrections, 419 F.3d 885 (9th Circ. 2005).

On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion. United States. v. Diebold Inc. 369 U.S. 654 (1962). "*Any doubt* as to the existence of any issue of material fact requires denial of the motion. (*Anderson*, 477 U.S. at 255)." Rogers v. Harker, 2021WL 2104966 (S.D. Cal. 05/25/2021). (Emphasis Supplied). "In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor." Dokes v. Safeway Inc., 2018 WL 1518562 (E.D. Cal. 03/28/2018). "A dispute of material fact is genuine if the evidence, viewed in light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party (citation omitted)." Cherewick v. State, 578 F.Supp. 1136 (S.D. 2022).

Plaintiff herein moves for summary judgment alleging that Defendant breached the Originator Agreement. "A plaintiff pleading a claim for relief for breach of contract under California law must show (1) a legally enforceable contract between the parties; (2) the plaintiff's performance or excuse for non-performance; (3) the defendant's breach of that contract (e.g., by failing to perform or performing inadequately); and (4) damage to the plaintiff caused by the defendant's breach. ( *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057, 1062 [9th Cir. 2017])." Cherewick, *supra*. It is not disputed herein that the parties entered into the Origination Agreement.

Thereafter, "[i]f *Plaintiff desired*, it would purchase and Defendant would assign" the Security Agreement (Devault agreement) to Plaintiff. (See Affidavit of Chelsea Wood, Par. "15"). Plaintiff does not dispute that on July 9, 2020, the same day that Defendant entered into the Security Agreement, Plaintiff "so desired" to purchase the Security Agreement from Defendant and entered into the Assignment.  The Assignment referenced the terms of the Origination agreement. Therefore, the two agreements can be read together. "The general rule under [section 1642] is that two or more separately executed instruments may be considered and construed as one contract only when upon their face they deal with the same subject-matter and are by reference to one another so connected that they may be fairly said to be interdependent (citations omitted)." Swinden v. Vanguard Group Inc., 2009 WL 3415376 (N.D. Cal. 10/21/09) *dist.other grds* Kagan v. Wachovia Securities LLC ( N.D. Cal. 07/07/2010).

### THE CONTRACT DOES NOT SPEAK TO WIRE TRANSFERS.

Plaintiff does not deny that it benefited from the Assignment and as part of the consideration due Defendant it was incumbent upon Plaintiff to pay Oshkosh, the supplier of the cement mixer. Thus, Plaintiff admits it assumed the duty to pay Oshkosh.  There is no language in the Origination Agreement or the Assignment specifically addressing payment terms; the term does not even occur in either agreement. "To state a cause of action for breach of contract, it is absolutely essential to plead the terms of the contract either in [verbatim] or according to legal effect". (*Twaite v. Allstate Ins. Co.*, 216 Cal. App. 239, 253 (1989)." Golden State Concessions LLC v. Wells Fargo Bank N.A., 2021 WL 5002222 ( N.D.Cal.03/10/2021). "Contrary to plaintiff's representations, that agreement plainly did not require defendant to obtain the consent of both trustees before authorizing a wire transfer. (*See Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir.2003) (court is 'not required to accept as true conclusory allegations which

are contradicted by documents referred to in the complaint' and may grant a motion to dismiss under such circumstances)." <u>Swinden</u>, *supra*.

Plaintiff, attempting to shift responsibility for the hacked wire transfer onto Defendant stretches far afield of the plain language of the Origination Agreement and incongruously alleges that Defendant breached its warranties and representations in that it would "provide Plaintiff with valid and authentic documents in connection with the transactions that were assigned to Plaintiff.". In support, Plaintiff references Para "5(A)" of the Origination agreement which provides in pertinent part:

> Paragraph "5(A)" of the Origination agreement provides:
> "All *executed* documents submitted to the bank by Originator will have been duly authorized, executed and delivered by all parties thereto including Originator, executed and delivered by all parties …. As to each proposed financing transaction no event has occurred or is continuing which constitutes a default thereunder …" ( Exh. "A").

Clearly Paragraph "5(A) \" is in reference to representations made by Defendant as originator of the financing transaction in of itself. See Wood Affidavit, Para. "15" Decandido Certification Para. 5C. Furthermore, Defendant's obligations ended when Plaintiff entered into the Assignment on July 9, 2020. The inclusion of the wire information was an accommodation, not an "executed document."

> 5. ABSOLUTE SALE OF ASSIGNED INTEREST/SECURITY AGREEMENT
> Originator and Buyer intend the Assignment of the Assigned Interest herein to be an absolute sale to buyer and do not intend it to be an assignment for security purposes only.

"Representations and warranties are statements of fact as of the date of the execution of the acquisition agreement, and the truthfulness of the representations and warranties as of both the date of execution and, when appropriate, the date of the closing is generally a condition to the closing. (citation omitted). In other words, the representations and warranties serve as a safety

net for the seller and buyer. If, prior to closing, either the seller or buyer discovers that a representation or warranty made by the other party is not true, they have grounds for backing out of the deal." Western Filter Corp. v. Argan Inc., 540 F.3d 947 (9th Circ. 2008). "The closing date itself triggers the contractual limitation on liability". Id. Plaintiff and Defendant closed on July 9, 2020. The alleged wire transfer hack occurred subsequently on July 16, 2020. Furthermore, even assuming for sake of argument that Defendant had any continuing obligations, it was not obligated under the Assignment to pay Oshkosh; Plaintiff was obligated and affirmatively took on that role. See Wood Affidavit, Paragraph"18". As revealed in Plaintiff's production, Plaintiff failed to adhere to its own procedures and failed to exercise proper care in handling the wire transfer. See also Swinden, supra. Plaintiff's position fails test 2 and 3 of Hickcox-Hoffman, supra.

Plaintiff has failed to prove that Defendant breached the Origination agreement. It has not established its prima facie right to summary judgment on its First, Second and Third Claims.

**PLAINTIFF CONCEDES THAT THE ORIGINATOR AGREEMENT DOES NOT DEFINE WHO BEARS THE RISK OF A HACKED WIRE TRANSFER.**

Alternatively, if Para "5(A)" of the Origination agreement is to be relied on to impose liability on Defendant, its terms are ambiguous. "Interpretation of a contract is a matter of law, as is the determination of whether a contract is ambiguous (citations omitted). Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation (citations omitted). Contract language is ambiguous if it is capable of two or more constructions, both of which are reasonable (citations omitted)." Congdon v. Uber Technologies, 291 F.Supp 3d 1012 (N.D. Cal. 03/08/2018). Extrinsic evidence may be used "to explain or interpret ambiguous contract language". Id. With respect to a form contract, and ambiguous terms, such terms would be construed against the drafter." Id.

Plaintiff concedes that the there is no direction pursuant to the Origination agreement or the Assignment as to the parties' obligations with respect to wire transfers but that payment to Oshkosh was assumed by and was in fact carried out according to custom and practice in the industry, **by Plaintiff**. (emphasis supplied)

> "As part of the consideration to be paid to Defendant, Defendant requested *as is common in the industry*, that Plaintiff pay Oshkosh, the supplier of the Truck, the Purchase Price (the "First Payment")." (Plaintiff's Memorandum of Law, page "2", Wood Affidavit at Para. "18"). Emphasis supplied.

Accordingly, Plaintiff's concession invites the consideration of extrinsic evidence by the Court. The gravamen of Plaintiff's argument is that Defendant should bear the risk of loss herein. However, Plaintiff's argument is misplaced. In the absence of contractual clarity, resort to the conduct of the parties and custom and practice in the trade may be resorted to. Clearly the overwhelming evidence is that the funding entity is responsible for wire instruction verification, especially as here where Wintrust chose wire of funds from among three payment options. Defendant has set forth more than a mere scintilla of evidence of material facts in dispute. See Miller v. Glen Miller Productions Inc., 454 F. 3d 975 (2006). Defendant has met its burden in opposing plaintiff's request for summary judgment and demonstrated that "the disputed fact might affect the outcome of the suit under the governing law (citation omitted)" and that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Dokes, *supra*.

## PLAINTIFF HAS NOT ESTABLISHED IT IS ENTITLED TO ANY DAMAGES.

As is conclusively demonstrated by the attachments to defendants R. 56 submission plaintiff has "charged-off" the loan, and then re-funded it, accepting the benefit of the absolute assignment and presumably receiving monthly payments in the past and future on this account.

Plaintiff does not attempt to quantify the effect of the charge-off nor does plaintiff posit any benefit from the resumption of the lender/debtor relationship with the Devault group. Such an omission is fatal to plaintiff's motion for summary judgment.

## POINT II
## DEFENDANT IS ENTITLED TO SUMMARY JUDGEMENT.

Jetcrete North America L.P. v. Austin Truck & Equipment Ltd. 484 F.Supp. 3d 915 (D.

Nevada 2020), being closely aligned to the facts herein, is instructive. In Jetcrete the buyer sued

the seller (Austin) of ready -mix concrete trucks for breach of contract and alleged that the seller

bore the risk of a hacker's use of seller's email and fraudulent wire transfer instructions resulting

in the theft of buyer's payment. In Jetcrete, it was not known how the hack occurred. Likewise,

herein, it is unknown how the hack was initiated.[3]

The Court in Jetcrete wisely determined:

> "No email platform is impervious to hacking and even the most
> sophisticated entities and governments have been hacked. Jetcrete
> seems to suggest a form of strict liability for hacks: because
> Austin's email platform was hacked, it must be liable for the
> resulting damage of Jetcrete's wiring funds to the wrong account.
> *Such a rigid standard is not practical in today's business
> environment.*" Id. ( Emphasis Supplied).

The Court further observed:

> Even if Austin failed to use reasonable care, that must be weighed
> against Jetcrete's actions, especially if Jetcrete, too, failed to use
> reasonable care. After Mr. Miranda and Ms. Schwartz received the
> fake emails changing the wiring instructions, Jetcrete and Thyssen
> failed to confirm the validity of the new instructions. Id.

Herein, Plaintiff received initial payment instructions on dated June 16, 2020 which,

according to directions initially furnished, directed payment to an account at Bank of America

for the benefit of Oshkosh, to its correct address in Chicago, by wire or ACH and by mail or

courier service. In addition, Plaintiff had obtained information independently by obtaining via

---

[3] Plaintiff notably did not name Devault or Oshkosh as a party to this lawsuit.

Docusign a verification form, which was not shared with Defendant. (Realmuto Cert. Para. **3)** These instructions also included instructions for payment by ACH and by check. Plaintiff must be charged with knowledge that Oshkosh is located in the Midwest, close by plaintiff based on prior dealings. On July 16, 2020 Plaintiff undertook to pay Oshkosh. Plaintiff **chose to wire payment to Oshkosh**. Plaintiff now had wire instructions dated July9, 2020 "which were different" Wood Affidavit.  Plaintiff was now prepared to wire funds to an account at Regions Bank for the benefit of another entity, MT Technologies, LLC with a Florida address. Wood Affidavit, Para. "20". The plaintiff, a division of Beverly Bank & Trust Co., a multi-billion-dollar banking conglomerate did nothing to verify that the now changed instructions were to a different bank, to benefit a different entity, it blindly proceeded, failing to note they were not legitimate. Decandido Cert. Ex. B.

In Jetcrete the court denied plaintiff's claim for breach of contract, holding:

> "The hack of Mr. Walpole's email account created the scenario for the loss. But Jetcrete was in the best position to prevent the loss by taking the reasonable precaution of verifying the wiring instructions by phone. Thus, even under an analysis based on Nevada Revised Statutes § 104.3404, Jetcrete should suffer the loss. *Arrow*, 2015 WL 4936272, at \*5. *Cf. S. Pac Co. v. Bd. of R Comm'rs of Cal.*, 78 F. 236, 252 (C.C.N.D. Cal. 1896) ("They being *in pari delictu*, the law gives aid to neither.")." Id.

Reference is made to plaintiff's postmortem email, attached to the Decandido Cert. as Exh. B.. Clearly the plaintiff was at fault in creating an erroneous wire transfer. Plaintiff chose the method of payment, eschewing an ACH or overnight delivery of a check. Plaintiff ignored several obvious signs of fraud. Conspicuous by its absence from the postmortem email is any suggestion that plaintiff did not already have fraud prevention measures in place and the absence of any blame ascribed to Pinnacle. Rather, it is stated:

"Unfortunately, this thoroughness stopped at arguably the most important part in the process, confirming the recipients of the wire. There were several red flags missed by funding that should have kept this transaction from progressing which included:

- last minute change in the wire instructions

- reliance on partner to confirm wire instructions with the vendor

- inconsistency in the formatting of the revised wire instructions (text, font, letterhead)

- email listed on the revised instructions appears to be a textbook case of email spoofing with the addition of the letters S into the email (examples omitted)

- names on the bank account not matching the vendor on the invoice

- changes in remittance bank

- inconsistent story regarding the need to change the wire amount due to the dollar amount of the wire. The financed amount did not change throughout the process, therefore there is no reason to believe the vendor did not already know the wire amount and would provide the accurate account information."

The recommendation for plaintiff's employees required retraining in the fraud prevention modalities that a lending institution such as Wintrust would be expected to have in place. Specifically,

- "additional training for the funding team on fraud and fraud prevention

- additional wire callback procedures added to funding including calling and confirming wire information on any wire over $50 K and on any new wire information received

- confirmation on all wires that the receiving party on a wire is the same as that invoicing.

- Address verification and routing confirmation of bank funds are being submitted to (sic)."

Recall that plaintiff had taken a complete assignment of the security agreement on or about July 9, 2020 and thus was the sole and 100% owner of the Devault payment obligation. Defendant no longer had any interest in the payments from Devault nor any interest in the collateral. Plaintiff failed to exercise the requisite standard of care incumbent upon its position and as provided in the analysis in Jetcrete. Id.

The result should be no different from Jetcrete herein. Based on the certifications Mr. Decandido and Ms. Realmuto herein, the affidavits submitted by plaintiff and the conclusion in Plaintiff's post mortem e mail, there is nothing implausible about the fact that, according to the parties' customary dealings and the practices of the industry, it was incumbent upon Plaintiff to verify the wire transfer instructions. See Matsushita Electrical Industrial Co.Ltd. v. Zenith Radio Corporation, 475 U.S.574 (1986). Similarly, defendant has established that there are no genuine issues of material fact as to this point, that plaintiff, through its own negligence, caused the harm complained of in this case and now seeks to impose that shortfall on an innocent party who did all that was required of it pursuant to the contract between Wintrust and Pinnacle.

## POINT III

### DEFENDANT'S AFFIRMATIVE DEFENSES SHOULD SURVIVE TO BE HEARD BY THE TRIER OF FACT

Based upon the material issues of fact raised by certifications of Mr. Decandido and Ms. Realmuto as well as the issues of law raised in the competing memorandums of counsel, it is respectfully submitted that an evaluation of the applicability of any particular assertion of the plaintiff or defense of the defendant should be determined by the trier of fact at the time pretrial memoranda are prepared and submitted.

There is certainly a factual basis for Pinnacle's first affirmative defense based upon the email dated January 14, 2021 (Wintrust Bates #151) to the question whether or not plaintiff has recoverable damages, having charged-off the loss in December 2020, re-funding the loan and presumably making a profit on the new instrument in their portfolio. In addition, the 15th and 16th affirmative defenses are clearly applicable to this dispute, namely, entities outside the control of the defendant such as Oshkosh and the plaintiff.

## CONCLUSION

The Court's inquiry herein is relegated to the "threshold inquiry of determining whether there is the need for a trial, whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Anderson</u>, *supra*. See also <u>Matsushita</u>, *supra*.  It is respectfully submitted that based on the aforementioned inquiry and the facts herein, the Court can only conclude that Plaintiff has not met its burden to be awarded summary judgment and that defendant has met its burden.

Dated:  Englewood Cliffs, New Jersey
          August 11, 2023

                                        */s/ Charles J. Lange, Jr.*
                                        Charles J. Lange Jr., Esq.

# EXHIBIT A

# ORIGINATOR PROGRAM AGREEMENT

This Originator Program Agreement ("Agreement") is made this 7th day of April, 2020 by and between **Wintrust Specialty Finance a division of Beverly Bank & Trust Company, N.A.** ("Bank"), with its principal place of business located at 2050 Main Street, Suite 230, Irvine, California 92614 and **Pinnacle Commercial Credit Inc.** (hereinafter "Originator"), **a New Jersey Corporation**, with its principal place of business located at **196 Kinderkamack Road, Park Ridge, NJ 07656**. Originator and Bank are hereinafter referred to as "the parties".

WHEREAS, Originator proposes from time to time to submit leases, equipment finance agreements, promissory notes, loan agreements, conditional sale contracts, installment sales contracts, chattel paper, or other transactions to Bank (hereinafter referred to as a "financing transaction" or "financing transactions") to Bank; and whereas, Bank proposes from time to time to acquire such financing transactions from Originator; therefore, in consideration of the premises, it is hereby accordance with and governed by the following terms and conditions:

**1.    Authority of Parties:**
The parties hereto are and shall act as independent business organizations, and as such, shall have no authority to incur obligations or to make any statements or representations on behalf of the other. Further, neither party shall have the authority to accept any payments on behalf of the other. Any payment received by Originator shall be held in trust for the benefit of the Bank. The parties shall not use the name of the other, or any of their respective trademarks as part of the other party's firm, trade, or corporate name, without express prior written authorization. Further, the parties shall not accept service of legal process on behalf of the other party, or employ attorneys to defend against such legal action, or take any legal proceedings in connection with any matter pertaining to the business of the other party except as may otherwise be stated herein. The persons executing this Agreement warrant and represent that they have the authority to do so and the authority to bind their respective party or parties.

**2.    Bank's Discretion:**
The Bank may from time to time, in its sole and absolute discretion, acquire streams of rentals of such financing transactions from Originator. Nothing herein shall require the Bank to acquire any transaction from Originator, and Originator shall not represent or warrant that a financing transaction will be acquired by the Bank prior to the actual acquisition. If the Bank elects not to acquire a financing transaction or any new financing transactions from Originator, it shall provide Originator notice of its election and Originator may seek alternate funding sources.

**3.    Documentation:**
All financing transactions shall be documented to the Bank's complete satisfaction on forms acceptable to Bank, at Bank's sole determination. Originator shall not alter the form of any document supplied by Bank without the prior written consent of Bank. Any documents, materials, and/or supplies furnished by Bank to Originator shall remain the property of Bank and shall be immediately returned to Bank upon demand. Originator shall not use Bank's documents for any Transaction which Bank elects not to acquire. Notwithstanding the providing of forms by Bank to Originator, Originator shall not represent to any person or entity that it is the agent, representative or employee of the Bank and Originator shall not act as agent of the Bank for any purpose absent the express written authorization by the Bank.

**4.    Disclosure of Information:**
Originator shall, in connection with any proposed financing transaction submitted to the Bank, keep the Bank informed of all information known to Originator concerning such financing transaction, including but not limited to the proposed lessee or debtor, the vendor/supplier of equipment, or the equipment or collateral, including any changes occurring or learned following submission of such proposed financing transaction to the Bank.

**5.    Warranties and Representations:**
With respect to each and every financing transaction submitted by Originator to the Bank, Originator expressly warrants and represents:

Case 2:20-cv-16589-SRC-CLW   Document 60   Filed 08/15/23   Page 22 of 36 PageID: 475

Case 2:20-cv-16589-SRC-CLW   Document 41-14   Filed 04/28/23   Page 3 of 7 PageID: 207

DocuSign Envelope ID: FD7C992E-FFE5-4A05-9578-BB90A4B09048
Case 2:20-cv-16589-SRC-CLW   Document 1-1   Filed 11/19/20   Page 2 of 6 PageID: 9

A)    All executed documents submitted to the Bank by Originator will have been duly authorized, executed and delivered by all parties thereto including, but not limited to Originator, any lessee, debtor, obligor, guarantor, pledgor, supplier or vendor and will be in full force and effect and will be valid, authentic, and binding upon and enforceable against the respective parties thereto in accordance with its terms. As to each proposed financing transaction no event has occurred and/or is continuing which constitutes a default thereunder by any party thereto or would constitute a default but for the requirement that notice be given or lapse of time or both.

B)    Each copy of the documents submitted to the Bank by Originator will be, at the time submitted or delivered and at the time designated hereunder, a true and complete copy of all documents constituting each financing transaction as in effect on each such date.

C)    The payment of all sums specified in the financing transaction shall be due and payable on the date or at the time set forth in the financing transaction and shall not be contingent upon the fulfillment or occurrence of any conditions or warranties, either express or implied, except as may be set forth in the lease, and Originator has made no claim or representation that is not specifically set forth in the financing transaction.

D)    No part of the money required to commence any financing transaction subject to this Agreement has been loaned, rebated, or advanced by Originator and Originator has not entered into any reciprocal agreements with any lessee, borrower, or officer, director, or guarantor thereof.

E)    A lease or other loan request shall not be split between various funding sources unless otherwise disclosed by Originator to the Bank in writing in the original lease or loan proposal.

F)    All financial and credit information of a prospective lessee, debtor and/or guarantor has been provided to the Bank, and no negative financial information or ratings have been deleted or concealed from the financial and credit information.

G)    For each Lease, Originator warrants good and marketable title to each item of leased equipment free and clear of any liens or encumbrances created by or arising through Originator and any lessee and Originator and lessee have not assigned or pledged the whole or any part of its or their rights under such lease or equipment related thereto. For each loan secured by equipment or other collateral, Originator warrants and represents that the Bank will have a first priority purchase money lien on equipment and a first priority lien on all collateral free and clear of any and all liens and encumbrances and that Originator has not pledged or assigned its right, title or interest in the equipment, collateral and the financing transaction.

H)    Originator has complied with all applicable licensing requirements, including but not limited to obtaining a California Finance Lenders License (if applicable), or its equivalent.

I)    Originator has complied with all applicable entity formation and governance requirements, and is in good standing under the laws of the state of its formation and is duly qualified or licensed to do business as a foreign entity, in good standing, in each other state wherein the conduct of its business or the ownership of its property would require such qualification or licensing or where the failure to be so qualified would have an adverse effect on the enforceability of Originator's rights under any financing transaction. This Agreement is the legal, valid and binding obligation of Originator, enforceable against Originator in accordance with the terms hereof. There is no consent, approval or authorization of, or filing or recording with, any governmental body or agency or of any company or person required to be obtained or made in connection with the execution, delivery and performance by Originator of this Agreement. There is no claim, action, litigation or proceeding before any court, governmental body or agency pending or threatened against Originator or, to the knowledge of Originator, pending or threatened against any lessee, guarantor, or equipment except as disclosed in writing to the Bank prior to the funding of any financing transaction.

J)    Originator warrants and represents that it has no agreements or arrangements with any vendor or supplier for undisclosed discounts, payments or kickbacks made by the vendor or supplier either to a lessee, borrower, or Originator with respect to any financing transaction submitted to the Bank.

Case 2:20-cv-16589-SRC-CLW    Document 60    Filed 08/15/23    Page 23 of 36 PageID: 476

Case 2:20-cv-16589-SRC-CLW    Document 41-14    Filed 04/28/23    Page 4 of 7 PageID: 208

DocuSign Envelope ID: 5D78D003E-F4FB-4A0B-9520-BBE9A9809568

Case 2:20-cv-16589-SRC-CLW    Document 1-1    Filed 11/19/20    Page 3 of 6 PageID: 10.

K) Unless otherwise disclosed in writing, any financing transaction shall not be the subject of a sale leaseback transaction.

L) No lessee, guarantor, obligor, supplier, vendor or pledgor shall be in bankruptcy at the time of the submission of any financing transaction by Originator to Bank.

M) Unless otherwise disclosed in writing all equipment to be leased or equipment to be pledged as collateral under a purchase money security interest shall be new and not used and is being acquired in connection with the financing transaction submitted to the Bank.

N) Originator warrants and represents that Originator has sourced each financing transaction directly and has not re-brokered or super-brokered any transaction unless disclosed in writing at the time of submission.

O) The version of the document that contains Originator's original signature or, if the document is fully executed electronically, the authoritative copy as defined by the Uniform Commercial Code, shall constitute the sole record of "chattel paper" for Uniform Commercial Code purposes and such originals have been delivered to Buyer, and copies certified by Originator as true, correct and complete facsimiles of the originals of all related Transaction Documents in Originator's possession have also been delivered to Buyer;

These representations, warranties, covenants and terms, are continuing and shall survive termination of this Agreement. Originator will provide additional information to Buyer as is necessary to maintain and confirm the accuracy and completeness of these representations, warranties, covenants and other agreements provided for in this Agreement

**6.    Compensation of Originator:**
For the duration of this Agreement, for each financing transaction approved and accepted by the Bank, Originator shall be entitled to the compensation at the Bank's then effective rates, which may be changed by the Bank at any time following thirty (30) days prior written notice to Originator. Originator acknowledges receipt of the rate structure in force and effect at the time any financing transaction is approved by the Bank.

**7.    Expenses of Originator:**
The Bank shall not be liable for any expenses whatsoever incurred by Originator in connection with any financing transaction submitted by Originator to the Bank.

**8.    Remarketing Assistance:**
Following the early termination, expiration or other cancellation of a Transaction and when Collateral is made legally available, Originator shall make best efforts to assist Buyer in the remarketing of the Collateral.

**9.    Indemnity:**
Originator agrees to indemnify and hold the Bank harmless for any and all expenses, injury and damage, including reasonable attorney's fees, which the Bank may hereafter incur, pay or suffer as a result of Originator's acts or any breach of Originator's obligations, representations and warranties set forth herein or in any assignment from Originator to the Bank or in connection with any financing transaction (including Originators dealings with any obligor, guarantor and/or vendor), submitted to the Bank and with respect to any equipment or collateral which is part of a financing transaction submitted to the Bank.  At Bank's request, not only will Originator indemnify and hold Bank harmless from any such damages but shall be required to defend Bank from any and all such claims, actions or causes of action at Originator's expense. The Bank shall have the right to approve counsel selected by Originator in connection with Originator's obligation to defend the Bank.

**10.    Right to Audit:**
The Bank shall have the right to enter upon Originator's business premises and inspect any files, computer or otherwise, associated with any financing transaction proposed or submitted, during normal business hours on 24 hours oral or written notice to Originator.  Said inspection shall also serve to assure the Bank that Originator has complied with all of the terms of this Agreement.

**11.  Originator Reimbursement:**
The Bank and Originator agree that in the event a lessee or borrower defaults on a financing transaction in the first one hundred twenty (120) days from the funding date, then Originator will be required to remit all funds received in excess of the equipment cost within five (5) business days of the Bank's demand therefor. This provision is not intended as an election of remedies and, in addition to this provision of this Agreement, the Bank may pursue any and all of its rights and remedies to collect all of its damages against all persons or entities as a result of the default and any breach of this Agreement or otherwise. Therefore, this provision of the Agreement is intended as cumulative and not the exclusive remedy of the Bank in the event of a breach of this Agreement or a default on the financing transaction.

**12.  Remedies for Breach:**
Besides the obligation of the Originator to pay its commission to the Bank as set forth in paragraph 10 above, in the event of a breach of any of the representations and warranties set forth in paragraph 5, above, Originator, within five (5) business days of receipt of the Bank's written demand, shall purchase the identified financing transaction(s) from the Bank for a sum equal to the past due amounts, including taxes, late charges, and all other fees costs , plus the outstanding remaining payments and any residual value of the equipment in the case of a lease, discounted at a rate of five percent (5%). If Originator fails to remit said funds within five (5) days, the Bank shall have the option to suspend the Bank's performance of this Agreement, without waiving any rights or remedies available hereunder.

In the event of a material breach of this Agreement, the non-breaching party shall be entitled to immediately suspend performance of any and all of its obligations hereunder and shall provide the breaching party with written notice of the material breach and an opportunity to cure the material breach within ten (10) business days.

Suspension of its obligations includes the obligations to pay commissions. Upon the cure of the material breach within ten (10) days, the non-breaching party shall perform as though the breach had not occurred. In the event the material breach is not cured within ten (10) business days, but is cured thereafter, the non-breaching party shall be excused of any performance that would have been required during the time of the default under this Agreement. The parties agree that all remedies contained in this Agreement are cumulative and not exclusive, and that both parties shall be entitled to exercise any and all rights afforded by applicable law in the event of a breach by the other party.

**13.  Term of Agreement:**
This Agreement shall be effective upon execution hereof, shall govern all of the transactions between the parties, past, present and future, and shall continue in effect until terminated by either party upon thirty (30) days prior written notice. The rights and obligations of the parties with respect to transactions originated prior to termination shall survive said termination.

**14.  Notices:**
Notices required or convenient under this Agreement shall be sent to the following respective addresses, until changed by written notification to the other party of the change of address:

Wintrust Specialty Finance
a division of Beverly Bank & Trust Company, N.A.
Attn: David Normandin
2050 Main Street, Suite 230
Irvine, CA 92614
Email: dnormandin@wintrust.com

Pinnacle Commercial Credit Inc.
Attn: Ed DeCandido
196 Kinderkamack Road
Park Ridge NJ 07656
Email: ed@pinnaclecommercialcredit.com

Any notice required or given hereunder shall be in writing and delivered to the recipient using any of the following methods: (a) by certified or regular U.S. Mail, postage prepaid (which shall be effective three (3) business days after mailing), or a nationally recognized overnight courier, with all fees prepaid (which shall be effective upon delivery), (b) by facsimile transmission (which shall be effective upon receipt during regular business hours, or if received after business hours upon the start of regular business hours of the next Business Day), or (c) by e-mail (which shall be effective upon confirmation of receipt).

OPA V2.0 2016.01

Case 2:20-cv-16589-SRC-CLW    Document 60    Filed 08/15/23    Page 25 of 36 PageID: 478
Case 2:20-cv-16589-SRC-CLW    Document 41-14    Filed 04/28/23    Page 6 of 7 PageID: 210
DocuSign Envelope ID: 5D76003E-EFB6-4908-B820-386648809646
Case 2:20-cv-16589-SRC-CLW    Document 1-1    Filed 11/19/20    Page 5 of 6 PageID: 12

**15.    Construction and Interpretation:**
This Agreement shall be deemed to be entered into and made to be performed in the County of Orange, the State of California, and shall be governed by and construed in accordance with the laws of the State of California.

**16.    Severability:**
In the event any provision of this Agreement shall be held to be invalid or unenforceable by any court of competent jurisdiction, such holding shall not invalidate or render unenforceable any other provision hereof.

**17.    Amendments and Modification:**
The terms and provisions of this Agreement shall not be waived altered, modified supplemented or amended in any manner whatsoever except by written instrument executed by the parties hereto. This Agreement is the entire agreement between the parties hereto with respect to the subject matter hereof and all oral and contemporaneous representations and agreements are merged herein. In addition, this Agreement may not be changed, amended or altered by any course of dealing or performance of the parties unless there is a written amendment or agreement signed by the appropriate parties.

**18.    Attorney's Fees:**
Should it become necessary for either party to enforce this Agreement, the prevailing party shall be entitled to its reasonable attorney's fees and costs as determined by a court of competent jurisdiction, regardless of whether suit is initiated and regardless whether the enforcement of the terms of this Agreement occurs in State, Federal Bankruptcy or other court or any other judicial tribunal or administrative proceeding.

**19.    Venue:**
The parties hereby agree that in the event suit is initiated to enforce the terms and provisions of this Agreement, venue shall be proper in the County of Orange, State of California, and the parties consent to the jurisdiction of the Courts of Orange County, State of California. **Each party hereto knowingly, voluntarily and without undue coercion or duress specifically waives trial by jury. If for any reason this jury trial waiver is not effective, then on election by either party, they may proceed by judicial reference as set forth in California Code of Civil Procedure, Sections 638, et. seq. However, such election must be made within ninety (90) days of any lawsuit being filed or the election will be deemed to be waived.**

**20.    Confidentiality:**
Each party hereto agrees to (i) hold all information including customer lists, vendor lists, database information, pricing information, economic model, employee information, financial information, and policy and procedure information (collectively "Confidential and Proprietary Information") in strict confidence and agrees to take reasonable precautions to protect such Confidential and Proprietary Information, (ii) not to divulge any such Confidential and Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use whatsoever at any time of such Confidential and Proprietary Information except in the course of this relationship, and (iv) not to copy, decompile, unscramble or reverse engineer any such Confidential and Proprietary Information. Any employee given access to any such Confidential and Proprietary Information must have a legitimate "need to know" and shall be deemed to be similarly bound. The parties agree that the foregoing clauses shall not apply with respect to any information that each can document (i) is or becomes generally available to the public, (ii) was in its possession or known by it prior to the receipt of same, (iii) was disclosed to it by a third party without restriction, or (iv) is independently developed without use of the other parties Confidential and Proprietary Information. In the event that the terms of this Agreement are the subject of discovery or subpoenaed, the subpoenaed party shall give the other party as much notice as possible and in no event less than 7 days so that the other party may proceed to obtain injunctive relief or a protective order if they deem it to be necessary. This provision may be specifically enforced and the parties agree that money damages will not necessarily compensate each other and any and all equitable relief is available for the parties to enforce this provision of the Agreement.

**20.    Counterparts; Signatures:**
This Agreement may be executed in counterpart with each counterpart being one and the same original document. This Agreement may be signed by facsimile or electronically and any such facsimile or electronic signature shall have the same force and effect as if it was an original ink signed document. Only authorized persons may sign this Agreement and unless the person signing this Agreement is at least a Vice President of the Bank and/or the Originator the Agreement will not be

Case 2:20-cv-16589-SRC-CLW    Document 60    Filed 08/15/23    Page 26 of 36 PageID: 479
Case 2:20-cv-16589-SRC-CLW    Document 41-14    Filed 04/28/23    Page 7 of 7 PageID: 211
Case 2:20-cv-16589-SRC-CLW    Document 1-1    Filed 11/19/20    Page 6 of 6 PageID: 13

DocuSign Envelope ID: 5D760003F-54FB-4A08-9520-BBE9A9809848

in force or effect. Further, any modification, extension, or amendment must also be signed by a Vice President or other authorized officer for it to be in force and effect.

Pinnacle Commercial Credit, Inc.

By: _____

Its:    Presidnet            7/8/2020

Wintrust Specialty Finance a division of Beverly Bank & Trust Company, N.A.

By: _____
        David Normandin
        4834SACEE0FD454

Its:    President & CEO

OPA V2.0 2016.01

# EXHIBIT B

cmaudlin@wintrust.com
Wintrust Specialty Finance is a division of Beverly Bank & Trust Company, N.A.

**From:** Maudlin, Chris
**Sent:** Tuesday, August 25, 2020 9:06 AM
**To:** Murphy, Tim <TMURPHY@wintrust.com>; Koleno, John <jkoleno@wintrust.com>
**Cc:** Biggam, Timothy <tbiggam@wintrust.com>; Calkin, Cary <ccalkin@wintrust.com>; Normandin, David
<DNormandin@wintrust.com>
**Subject:** Wire Confirmation

**Chris Maudlin, CLFP**
**SVP, Chief Credit Officer**

# WINTRUST
## SPECIALTY FINANCE

2050 Main St, Suite 230, Irvine, CA 92614
Office: 949.268.9095
Cell: 949.637.4784

cmaudlin@wintrust.com
Wintrust Specialty Finance is a division of Beverly Bank & Trust Company, N.A.

WINTRUST00153

Devault / Pinnace Commercial Credit, Inc. review.

- **Submission:** Transaction submitted through salesforce partner portal by Pinnacle on 7/1/2020 @ 10:43AM
  - Email submitted: tim@pinnaclecommercialcredit.com
  - Comment on submittal from Pinnacle: "Devault Group Inc. is a current customer of Pinnacle and have not had any issues with payment. They operate in the concrete industry. Covid-19 has not impacted their business and they are busier than last year."
  - Address submitted for Devault is a person residence 16 Lempa Road, Holland, Pennsylvania 18966 United States
  - Equipment location is off from company website.  Equipment location: 6318 Passyunk Ave, Philadelphia, PA 19153
  - Business location per website: https://devaultgroup.com/#49f05ea9-36eb-49d0-af98-d083a7f2a120, 6100 Passyunk Avenue, Philadelphia, Pennsylvania 19153, United States
  - Application received from Pinnacle is a printed PDF created by Pinnacle showing PG of Melissa Hagstotz
  - Business address listed on the app is listed as Business address (16 Lempa Road, Holland, PA 18966)
  - SOS notes a separate address for Melissa of 98 Jacksonville Rd, Warminster, PA 18974
- **Approval:** Transaction approved on 7/1/2020 @ 6:09PM
  - Email approval sent to: tim@pinnaclecommercialcredit.com
- **Documents In:** 7/14/2020 8:21 AM by Chelsea Wood **(1-Devault Group Email)**
  - Email from Paula Realmuto at Pinnacle. paula@pinnaclecommercialcredit.com
  - Email notes the contact for e-verification is Melissa@devaultgroup.com
  - Funding documents include a UCC filing by Pinnacle in the name of Beverly Bank and Trust with a completed UCC filing on 7/9/2020
  - Transaction is structured as a loan for $237,753 with the pledged collateral of the 2020 Oshkosh Model S-2204 Concrete Mixing Truck
  - Addresses match those in salesforce of mailing address: 16 Lempa Road, Holland, Pennsylvania 18966 United States and shipping address of 6318 Passyunk Ave, Philadelphia, PA 19153
  - Documents appear to be wet signed by Melissa Hagstotz as Sole Officer
  - Invoice in funding package shows the vendor as OshKosh Corporation with a remittance notice of 7747 Collections Center Dr, Chicago, IL 60693
  - Wire Instructions included are listed on OshKosh letterhead with an address of 1917 Four Wheel Drive, Oshkosh, WI 54902.
    - ACH and Wire information notes account name under Oshkosh Corporation and the Bank as Bank of America.
    - The ACH information notes a Chicago address for Bank of America (135 LaSalle St, Chicago, IL 60606).
    - The wire information notes a New York Address for Bank of America (100 West 33rd St, 4th Fl., New York City, NY 10001)
    - Account numbers for both wire and ACH instructions are the same.
    - Remittance address for a Check matches the remittance address of the invoice (7747 Collection Center Dr, Chicago, IL 60693)

- Remittance detail is requested to be sent to corcashapp@oshkoshcorp.com
- Questions contact is listed as Aaron Spaulding aspaulding@oshkoshcorp.com with a phone number of 920-502-3057
  - I called the 920-502-3057 number and it went to the voice mail of Aaron Spaulding. No mention of the company on the automated listing.
- Font and coloring from the scanned copy appear consistent and not altered.
- The document package appears to have been scanned as a set by Pinnacle prior to sending
  ○ Site inspection was conducted and included in the funding submittal
    - Inspection took place at 3301 S 61st St, Philadelphia, PA 19153.  This is not an address we have on our docs or file
    - Inspector notes that the address that comes up on GPS is 6100 Passyunk Avenue, Philadelphia, Pennsylvania 19153. This is the address listed on DeVault's website.
    - Inspection notes the name on the building is "Castor Materials"
    - Inspection notes "The equipment was inspected at Castor Materials and was being lettered. Castor Materials is a division of Devault Group. Equipment is new. Castor Materials is a large concrete plant."
    - Inspection pictures show the lettering on the equipment is "Castor Materials"
- Email from Paula thanking Chelsea for the notice:  7/14/2020 8:46 AM **(2-Devault Group Email)**
- **Pending Missing Documents:** 7/14/2020 10:20AM by Chelsea Wood
  ○ Initial Email from Chelsea to Paula @ 8:51AM 7/14/2020 **(3-RE Devault Group Inc)**

    Hi Paula,
    I'm starting my review of this one and just wanted to ask a quick question. The SOS shows Renee Hagstotz as the VP of the company. Do you have proof that this has changed and that Melissa is now the sole officer of the company?

    I'll keep going with my review, but wanted to point that one out.

    Thanks,

    **Chelsea Wood, CLFP**
    **VP, Funding Manager**

  ○ Follow up email from Paula (paula@pinnaclecommercialcredit.com) at 9:00AM **(4- RE Devault Group Inc)**
    7/14/2020 notes:  "I will ask the customer for documentation & send it to you.
  ○ Follow up email from Paula noting "See Below" 7/14/2020 9:33AM **(5- RE Devault Group Inc)**
    Email chain forwarded from Paula (paula@pinnaclecommercialcredit.com) at 9:59AM 7/14/2020 contains emails from melissa@devaultgroup.com stating she is the sole owner however "I don't have anything documentation to prove it." To which Paula responds: "OK Melissa, is Renee Hagstotz any part of the company?" response from Melissa was "No, I am 100% owner."

○ Chelsea email to Paula 7/14/2020 10:00AM **(6- RE Devault Group Inc)**

Hi Paula,

She may be sole owner of the company, but have appointed other officers.

We can accept it as is with Pinnacle's reps and warrants that your team has done their due diligence to confirm different than the SOS filing that Melissa is sole officer. Let us know if you agree with this and I'll keep this e-mail as our record.

Below are also the other items/questions that we have:
- Who is completing the title work?
- Proof of down payment listed on the vendor's invoice (you already mentioned working on this, thank you!)
- For your commission invoice, do you have something that you can provide for that?
  ○ Lately we have just been using our calculation page, but it would be super helpful if you could provide some sheet with the breakdown of the gross commission, minus our processing fee, minus any advances collected with the balance being what is owed to Pinnacle/the shortfall amount due to WSF with each funding package.
  ○ I did confirm that is the accurate shortfall amount though.
- The site inspection shows the truck being lettered with another entity's name that the site lists as a division of Devault Group. I'm attaching their SOS for you. Is Credit aware that the other entity will be using this equipment?

Thanks for your help with this.

○ Email from Paula: 7/14/2020 1:03PM **(7- RE Devault Group Inc)**
  ▪ Based on Chelsea's email Paula emailed Melissa regarding Castor Materials. Melissa (Devault) replies that the loan and title will be in Devault's name. Also Melissa includes a picture showing a decal on a truck (similar paint scheme to the truck in the site inspection) noting "Operated by Devault Group, Inc. MC#827838, USDOT 1946314, PA PUC#A-8915750. (Note a lookup today of the USDOT # confirms this number matches for Devault Group)

  ▪ Ed from Pinnacle (ed@pinnaclecommercialcredit.com) notes to Paula:

  Paula:

  In PA you can decal and register a truck in another companies name but it must have the owners info on it which it does. Castor is her dad's company and that is where she gets all her concrete from. Since she goes on a lot of union jobs she goes in under Castor as it is a union company. She is a WME (Woman Minority Enterprise) and has no union employees.

  Ed

- Finally at the top of the email Paula notes they agree that Melissa is the sole officer.
- o  Email from Chelsea to the Credit Team 7/14/2020 1:26PM **(8- RE Devault Group Inc)**
  - Chelsea emails the credit team alerting them to the decal being done in a different company name to see if Credit will require the CCG and also if Credit was aware of this.
- o  Email from Chelsea to the Paula 7/14/2020 1:27PM **(9- RE Devault Group Inc)**
  - Chelsea also emails Paula letting her know she has sent the file to Credit fo review. Also Chelsea asks the following question "Just for clarification, is Castor Material, then the entity that is operating and utilizing the truck?
- o  Email from Paula to Chelsea: 7/14/2020 1:36PM **(10- RE Devault Group Inc)** confirming that Devault Group will be utilizing the truck with her drivers.
- o  Email from Chelsea to the Paula 7/14/2020 5:09PM **(11- RE Devault Group Inc)**
  - Chelsea let's Paula know that credit has approved and we are OK moving forward. Chelsea also notes that she will review the file again in the morning and submit to audit and signatures.
  - Emails on the file were:
    - paula@pinnaclecommercialcredit.com
    - ed@pinnaclecommercialcredit.com
    - SVanderZ@wintrust.com
    - EGrigoro@wintrust.com
    - NGibbens@wintrust.com
- o  Email from Paula to Chelsea including the down payment check to the vendor. 7/15/2020 7:14AM **(12- RE Devault Group Inc)** Same emails as above included on this reply
- o  Email from Chelsea to Paula noting Chelsea has sent out the "e-verification to Melissa to sign". 7/15/2020 8:30AM **(13- RE Devault Group Inc)** Same emails as above included on this reply
- o  Email from Paula to Chelsea: "Thank you, I will let the customer know to look out for our email." 7/15/2020 10:04AM. Only Chelsea and Paula emails on this reply. **(14- RE Devault Group Inc)**
- o  Email From Paula to Chelsea: "I just heard from the vendor that they need to send me new wiring instructions because they dollar amount is over $200,000.00  Has the wire already been sent to the vendor?" 7/16/2020 8:17AM**(15- RE Devault Group Inc)**
  - Emails on the file were:
    - paula@pinnaclecommercialcredit.com
    - ed@pinnaclecommercialcredit.com
    - SVanderZ@wintrust.com
    - EGrigoro@wintrust.com
    - NGibbens@wintrust.com
  - ***Clearly we need to see the email here from the vendor to Pinnacle. From what I seeing the Pinnacle emails are all still the same we have been using.  Things we do not know would be if Pinnacle was the one hacked and the communication with the vendor was copied or if it was the customer. Seeing***

*the email history between the Vendor and Pinnacle as well as the customer will be critical.*

o Email from Chelsea to Paula noting she is preparing the file for funding and will hold off until *"you confirm the new wiring instructions with the vendor."* This email was sent on 7/16/2020 8:19AM. We need to add this file to our chain as it was only visible from the next email.

o Email from Paula to Chelsea with updated wiring instructions. 7/16/2020 8:37AM **(16-RE Devault Group Inc)**

- **Document observations:**
  - At first glance the updated wire instructions look like normal instructions and closely resemble the instructions previously sent.
  - The OshKosh logo in the upper left-hand corner appears slightly blurred which is out of place as the rest of the font is all crystal clear.
  - No mention on the document denotes these wire instructions are for transactions over $200,000 as noted in the email from Pinnacle. Considering the transaction size has not changed it should be a flag that we are being asked to change the wire information at the last moment.
  - The date font looks to be a different size and font from the rest of the document.
  - Remittance detail email notes an address of corcashapp@oskoshcorps.com

- **Side by Side Document observations:**
  - The original instructions look to be scanned and have a consistent coloring and font. The new documents have a distorted logo for OshKosh and keep the original wire instruction date (July 9, 2020). It appears that the original wire instructions were used for a template and the logo and date were used.
  - The address in the right hand corner of the new instructions is a different size in comparison to the original instructions. All font on the updated instructions outside of the date appears to be very clear and not in alignment with the blurred logo.
  - Updated instructions do not include ACH information. This leads to a large amount space on the new instructions between the initial sentence and the wire instructions.
  - The order of the wire information on the updated instructions does not match the prior instructions:
    - o Original
      - Account Name
      - Bank Name
      - Bank Address
      - Account Number
      - Routing
    - o Updated
      - Bank Name

- - Account Name
  - Bank Address
  - Account Number
  - Routing
- The account name on the updated instructions are for a different company (MT Technologies LLC) vs Oshkosh Corporation
- Bank information on the updated statement is for a different bank (Regions Bank vs Bank of America) and State (IN vs IL).
- Another oddity is that the text on the new document searchable and the spacing off between the wire instructions and the paper remittance.
- Finally the email provided remittance email (corcashapp@oshkoshcorps.com) has an additional (s) on it so the correspondence would not go to the appropriate email corecashapp@oshkoshcorp.com

o Email from Chelsea to Paula letting her know the file was sent out. This email was sent on 7/16/2020 8:42AM. We need to add this file to our chain as it was only visible from the next email.

o Email from Paula to Chelsea asking Chelsea to send the wire confirmation once she has it. 7/16/2020 10:05AM (17- RE Devault Group Inc)

o Email from Chelsea to Paula letting her know she will confirm when funds are sent out. 7/16/2020 10:16AM (18- RE Devault Group Inc)

o Email from Chelsea to Paula with wire confirmation number. 7/16/2020 10:20AM (19- RE Devault Group Inc)

o Email from Paula to Chelsea with shortfall wire confirmation number. 7/16/2020 12:47PM (20- RE Devault Group Inc)

o Email from Ed to Nick from 8/24/2020
  - This email looks to have the spoof related to the wire instructions.
  - The original email from a Rick Ross has two OshKosh logos at the bottom of the email which are odd. The address is for a personal address (4192 S. Old State Rd. 15 | Wabash, IN 46992) This maybe Rick's address as McNeilus does not show locations in Indiana.
  - Rick's email in his signature block looks to be real with the associated domain of mcneilusco.com
  - However the email is sent from the spoofed address of rross@oshkoshcorps.com with the additional S inserted similar to our updated wire instructions.
  - This email was sent to both the PG and Pinnacle on 7/16/2020 11:33AM
  - On Friday it appears that Paula emailed both the real Rick Ross (rross@mcneilusco.com) and the spoofed Rick Ross (rross@oshkoshcorps.com) along with Ed from Pinnacle and the PG showing the wire confirmation and instructions. I am assuming this is due to OshKosh noting they had not been paid.
  - Today there is an email from Melissa which is noting the issue has been resolved and that is coming from her email (same email we have had throughout the

process) melissa@devaultgroup.com . This email was sent to just the Pinnacle team with Rick Ross removed from the chain.

**Potential Fraud Actor:**

The remittance information on the updated wire information noted a company of MT Technologies LLC, a bank address for Regions Bank of 3914 Lake Clearwater Pl, IN 46240 (no city listed), and a receiver address of 231 US 31 S, Indianapolis, IN 46227.

- **MT Technologies LLC** Incorporated on 3/30/2020. Single Officer of Marie Waline Theor and an address of 4665 Edwardian Cir, Apt 2C, Indianapolis, IN 46254.
  - ○ Notes from Connor:
    - Marie Theor no longer resides at the address listed on the SOS, she actually moved out of there in Dec. 2018 per LexisNexis and some additional info (White Pages / AnyWho). She now lives at 466**1** Edwardian Circle Apt 1a. (See first two attachments)
    - LexisNexis Fraud Risk Indices:
      - ○ 5 of 6 data points are 1/10 (extremely low risk); with the exception of one. Suspicious Activity which came in high at 9/10. This just means the identity in itself has previously high risk activity. (3rd attachment)
      Things I know:
    - I have confirmed Marie's associated email addresses and phone numbers. Email addresses are considered "trustworthy" according to WhitePages Pro. Which would help in further due diligence if we have an invoice.
    - I can go down a much bigger and more defined rabbit hole with an invoice.
- **Bank address for Regions Bank of 3914 Lake Clearwater Pl, IN 46240**
  - ○ A Google search of this address shows this to be an apartment complex
- **Receiver address of 231 US 31 S, Indianapolis, IN 46227**
  - ○ A Google search of this address shows this to be an Single Family Home

**Conclusion:**

The WSF funding team conducted a thorough review of the file during the bulk of the funding process including identifying inconsistencies in addresses (site inspection), ownership (SOS listings), and a potential additional entity involved (site inspection). In all of these instances funding followed for documentation and clarification in order to move forward. Once the information was gathered, it was then submitted to Credit for review and approval.

Unfortunately this thoroughness stopped at arguably the most important part in the process, confirming the recipients of the wire. There were several red flags missed by funding that should have kept this transaction from progressing which included:

- Last minute change in wiring instructions
- Reliance on partner to confirm wire instructions with the vendor
- Inconsistency in the formatting of the revised wire instructions (text, font, letter head)

- Email listed on the revised instructions appears to be a textbook case of email spoofing with the addition of the letter s into the email. (corcashapp@oshkoshcorps.com vs the original and accurate email corecashapp@oshkoshcorp.com)
- Names on the bank account not matching the vendor on the invoice
- Changes in remittance bank
- Inconsistent story regarding the need to change the wire account due to the dollar amount of the wire. The financed amount did not change throughout the process, therefore there is no reason to believe the vendor did not already know the wire amount and would provide the accurate account information.

Recommendations:

- Additional training for the funding team on fraud and fraud prevention
- Additional wire call back procedures added to funding including calling and confirming wire information on any wire over $50K and on any new wire information received.
- Confirmation on all wires that the Receiving party on a wire is the same as that invoicing.
- Address verification and Routing confirmation of bank funds are being submitted to.

Person of Interest:

- I would recommend that we alert the appropriate authorities regarding the fraud and that Marie Waline Theor and all related addresses and bank account be investigated.